977 F.2d 872
 61 USLW 2226, 39 Soc.Sec.Rep.Ser. 161,
Medicare & Medicaid Guide P 40,816
 Barry BABER, Administrator of the Estate of Brenda Baber,
Plaintiff-Appellant,
v.
HOSPITAL CORPORATION OF AMERICA, a West Virginia
Corporation; Hospital Corporation of America, d/b/a HCA
Group, Incorporated, Tennessee Corporation; Raleigh General
Hospital, a West Virginia Corporation; Appalachian Regional
Healthcare, Incorporated, d/b/a Beckley Appalachian Regional
Hospital, a Kentucky Corporation, Beckley Appalachian
Regional Hospital; Richard B. Kline; Joseph Whelan,
Defendants-Appellees.
 No. 91-2395.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1992.
Decided Oct. 7, 1992.
As Amended Nov. 9, 1992.
 
 Barbara H. Lupton, Masters & Taylor, Charleston, W.Va., argued (Marvin W. Masters, Kathleen T. Pettigrew, Lee H. Adler, Ithaca, N.Y., on the brief), for plaintiff-appellant.
 William H. File, Jr., File, Payne, Scherer & Brown, Beckley, W.Va., Karen Speidel Rodgers, Kay, Casto, Chaney, Love & Wise, Geraldine M. Guerin, Shuman, Annand & Poe, Charleston, W.Va., Charlotte Ann Hoffman, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, W.Va., argued (Ann L. Haight, Michael J. Farrell, on the brief), for defendants-appellees.
 Before ERVIN, Chief Judge, WILLIAMS, Circuit Judge, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 Barry Baber, Administrator of the Estate of Brenda Baber, instituted this suit against Dr. Richard Kline, Dr. Joseph Whelan, Raleigh General Hospital (RGH), Beckley Appalachian Regional Hospital (BARH), and the parent corporations of both hospitals. Mr. Baber alleged that the Defendants violated the Emergency Medical Treatment and Active Labor Act (EMTALA),[1] 42 U.S.C.A. § 1395dd (West 1992). The Defendants moved to dismiss the EMTALA claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the parties submitted affidavits and depositions, the district court treated the motion as one for summary judgment. See Fed.R.Civ.P. 12(b).
 
 
 2
 Mr. Baber's complaint charged the various defendants with violating EMTALA in several ways. Specifically, Mr. Baber contends that Dr. Kline, RGH, and its parent corporation violated EMTALA by:
 
 
 3
 (a) failing to provide his sister with an "appropriate medical screening examination;"
 
 
 4
 (b) failing to stabilize his sister's "emergency medical condition;" and
 
 
 5
 (c) transferring his sister to BARH without first providing stabilizing treatment.
 
 
 6
 Mr. Baber also charged Dr. Whelan, BARH, and its parent corporation with failing to provide his sister with an "appropriate medical screening" upon her admission to BARH.
 
 
 7
 After reviewing the parties' submissions, the district court granted summary judgment for the Defendants. The court concluded that patients may not sue their physicians for EMTALA violations and therefore granted Dr. Kline and Dr. Whelan summary judgment. The district court further concluded that Mr. Baber failed to submit evidence tending to show either that RGH failed to provide "an appropriate medical screening," 42 U.S.C.A. § 1395dd(a), or that RGH knew Ms. Baber had an "emergency medical condition" that required stabilization before transfer to another hospital, id. §§ 1395dd(b) & (c). Finally, the district court found that BARH was not required to perform an "appropriate medical screening" on Ms. Baber upon her admission to that hospital because the screening requirement applies only to a patient who seeks treatment from an emergency department. Accordingly, the district court granted summary judgment in favor of the hospitals and their parent corporations.[2] Finding no error, we affirm.
 
 I.
 
 8
 We review a grant of summary judgment de novo, applying the same standard as the district court. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). Specifically, summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(c)). A district court must grant summary judgment if, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
 
 
 9
 In summary judgment proceedings, the moving party must demonstrate the absence of a genuine issue of material fact. Temkin, 945 F.2d at 718. Once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show that there is a genuine issue for trial. Richmond, F. & P. R.R. v. United States, 945 F.2d 765, 768 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). While this does not require the non-moving party to submit evidence in a form that would be admissible at trial, Celotex, 477 U.S. at 324, 106 S.Ct. at 2553, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion," Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir.1987).
 
 
 10
 In reviewing the evidence submitted by the parties on appeal, we must view all evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255, 106 S.Ct. at 2514.
 
 II.
 
 11
 In the present case, the material facts regarding EMTALA liability are undisputed. Brenda Baber, accompanied by her brother, Barry, sought treatment at RGH's emergency department at 10:40 p.m. on August 5, 1987. When she entered the hospital, Ms. Baber was nauseated, agitated, and thought she might be pregnant. She was also tremulous and did not appear to have orderly thought patterns. She had stopped taking her anti-psychosis medications, Haldol and Cogentin, and had been drinking heavily. Dr. Kline, the attending physician, described her behavior and condition in the RGH Encounter Record as follows:
 
 
 12
 Patient refuses to remain on stretcher and cannot be restrained verbally despite repeated requests by staff and by me. Brother has not assisted either verbally or physically in keeping patient from pacing throughout the Emergency Room. Restraints would place patient and staff at risk by increasing her agitation.
 
 
 13
 (J.A. at 53.)
 
 
 14
 In response to Ms. Baber's initial complaints, Dr. Kline examined her central nervous system, lungs, cardiovascular system, and abdomen. He also ordered several laboratory tests, including a pregnancy test.
 
 
 15
 While awaiting the results of her laboratory tests, Ms. Baber began pacing about the emergency department. In an effort to calm Ms. Baber, Dr. Kline gave her five milligrams of Haldol. When this failed to relieve Ms. Baber's hyperactivity and agitation, he administered 100 milligrams of Thorazine. He also gave Ms. Baber 100 milligrams of Thiamine and two ounces of magnesium citrate because of her earlier alcohol consumption. The medication did not immediately control her agitation. Mr. Baber described his sister as becoming restless, "worse and more disoriented after she was given the medication," and wandering around the emergency department. (J.A. at 45.)
 
 
 16
 While roaming in the emergency department around midnight, Ms. Baber, without warning, convulsed and fell, striking her head upon a table and lacerating her scalp. The seizure lasted three minutes, but she quickly regained consciousness and emergency department personnel carried her by stretcher to the suturing room. Once in the suturing room, Dr. Kline examined her again. He obtained a blood gas study which did not reveal any oxygen deprivation or acidosis. Ms. Baber was verbal and could move her head, eyes, and limbs without discomfort. With attendants restraining her limbs, Dr. Kline closed the one-inch laceration with a couple of sutures. Although she became calmer and drowsy after the wound was sutured, Ms. Baber was easily arousable and easily disturbed. Ms. Baber experienced some anxiety, disorientation, restlessness, and some speech problems, which Dr. Kline concluded were caused by her pre-existing psychiatric problems of psychosis with paranoia and alcohol withdrawal.
 
 
 17
 Dr. Kline discussed Ms. Baber's condition with Dr. Whelan, the psychiatrist who had treated Ms. Baber for two years. Dr. Whelan believed she suffered from undifferentiated schizophrenia and noted that her mental illness was associated with periods of extreme alcohol abuse.[3] Dr. Whelan concluded that Ms. Baber's hyperactive and uncontrollable behavior during her evening at RGH was compatible with her behavior during a relapse of her serious psychotic and chronic mental illness. Both Dr. Whelan and Dr. Kline were concerned about the seizure she had while at RGH's emergency department because it was the first one she had experienced. They believed the seizure might be linked to Ms. Baber's psychosis. They also agreed Ms. Baber needed further treatment for what they believed to be her recurring psychiatric problems and decided to transfer her to the psychiatric unit at BARH because RGH did not have a psychiatric ward, and both doctors believed it would be beneficial for her to be treated in a familiar setting. The decision to transfer Ms. Baber was further supported by the doctors' belief that any tests to diagnose the cause of her initial seizure, such as a computerized tomography scan (CT scan), could be performed at BARH once her psychiatric condition was under control. The transfer to BARH was discussed with Mr. Baber who neither expressly consented nor objected. His only request was that his sister be x-rayed because of the blow to her head when she fell.
 
 
 18
 Although Mr. Baber stated that he did not see Dr. Kline perform any type of examination on his sister between the suturing of her scalp and her transport to BARH by ambulance, Dr. Kline testified in his deposition that for approximately an hour subsequent to the convulsion he watched Ms. Baber from across the room for focal neurological signs. Dr. Kline also stated she was stable, easily arousable, not struggling at random, and, in his medical judgment, she had shown improvement by the time of transfer.
 
 
 19
 Because Dr. Kline did not conclude Ms. Baber had a serious head injury, he believed that she could be transferred safely to BARH where she would be under the observation of the BARH psychiatric staff personnel. At 1:35 a.m. on August 6, Ms. Baber was admitted directly to the psychiatric department of BARH upon Dr. Whelan's orders. She was not processed through BARH's emergency department. Although Ms. Baber was restrained and regularly checked every fifteen minutes by the nursing staff while at BARH, no physician gave her an extensive neurological examination upon her arrival. Mr. Baber unsuccessfully repeated his request for an x-ray.
 
 
 20
 At the 3:45 a.m. check, the nurse found Ms. Baber having a grand mal seizure. At Dr. Whelan's direction, the psychiatric unit staff transported her to BARH's emergency department. Upon arrival in the emergency department, her pupils were unresponsive, and hospital personnel began CPR. The emergency department physician ordered a CT scan, which was performed around 6:30 a.m. The CT report revealed a fractured skull and a right subdural hematoma. BARH personnel immediately transferred Ms. Baber back to RGH because that hospital had a neurosurgeon on staff, and BARH did not have the facility or staff to treat serious neurological problems. When RGH received Ms. Baber for treatment around 7 a.m., she was comatose. She died later that day, apparently as a result of an intracerebrovascular rupture.
 
 III.
 
 21
 The district court granted summary judgment for Dr. Kline and Dr. Whelan because it found that EMTALA does not give patients a private cause of action against their doctors. We review this finding de novo because the interpretation of a statute is a question of law. See North Carolina v. Fed. Aviation Admin., 957 F.2d 1125, 1128 (4th Cir.1992) (questions of law are reviewed de novo). Because we hold EMTALA does not permit private suits for damages against the attending physicians, we affirm the district court's grant of summary judgment for Dr. Whelan and Dr. Kline.
 
 
 22
 Although the statute clearly allows a patient to bring a civil suit for damages for an EMTALA violation against a participating hospital,[4] 42 U.S.C.A. § 1395dd(d)(2)(A),[5] no section permits an individual to bring a similar action against a treating physician. Instead, the enforcement sections of EMTALA allow an action against a physician only by the Department of Health and Human Services to bar his participation in Medicare programs and/or to seek administrative sanctions in the form of civil monetary penalties. 42 U.S.C.A. §§ 1395dd(d)(1) & (2)(B). Thus, nothing in the language of the statute permits a private individual to recover personal injury damages from a physician for an EMTALA violation.
 
 
 23
 The statute's legislative history makes it clear that, far from intending to allow patients to sue doctors, Congress intentionally limited patients to suits against hospitals. An earlier draft of § 1395dd(d)(2) simply provided patients with a private cause of action for EMTALA violations. Congress rejected this draft version as vague because it "did not precisely identify which parties could bring actions under the provisions, nor did it identify those against whom they could bring such action." H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 6, (1986) reprinted in 1986 U.S.C.C.A.N. 42, 579, 728. The Committee noted that the amendment, which was subsequently adopted, made it clear that:
 
 
 24
 [T]he section authorizes only two types of actions for damages. The first of these could be brought by the individual patient who suffers harm as a direct result of a hospital's failure to appropriately screen, stabilize, or properly transfer that patient. The second type of action could be brought by a medical facility which received an improperly transferred emergency patient (within the meaning of § 124) or a woman in active labor. It also clarifies that actions for damages may be brought only against the hospital which has violated the requirements of § 124.
 
 
 25
 Id. at 6-7, reprinted in 1986 U.S.C.C.A.N. at 728 (emphasis added). Thus, the statute's legislative history demonstrates that Congress intended to limit the patient's right to recover damages for violations of EMTALA to suits against hospitals.
 
 
 26
 Other courts addressing this issue have also concluded that EMTALA does not permit a private cause of action for damages against a physician. See Jones v. Wake County Hosp. Sys. Inc., 786 F.Supp. 538, 545 (E.D.N.C.1991) ("Section 1395dd(d)(2) only provides for a private cause of action by an individual injured by a violation of COBRA against the 'participating hospital.' There is no mention of a private cause of action against an individual physician in the statute."); Delaney v. Cade, 756 F.Supp. 1476, 1487 (D.Kan.1991) (holding that EMTALA does not provide a private cause of action against individual physicians and noting that "[i]f Congress had intended to create a private cause of action against a physician, it knew how to do so").
 
 
 27
 Mr. Baber nonetheless asks that we expand the list of potential defendants in a personal injury cause of action under EMTALA to include treating physicians. In support of his position, Mr. Baber cites Burditt v. United States Dep't of Health & Human Serv., 934 F.2d 1362 (5th Cir.1991), and Sorrells v. Babcock, 733 F.Supp. 1189 (N.D. Ill.1990). We find both of these decisions inapposite.
 
 
 28
 In Burditt, a doctor appealed the imposition of administrative sanctions under § 1395dd(d)(2)(B). 934 F.2d at 1366. Administrative sanctions are penalties imposed by and paid to the Department of Health and Human Services; they are not available to private parties. Moreover, the fact that physicians are subject to administrative sanctions does not imply that they are also subject to private suit. See 42 U.S.C.A. § 1395dd(d) (barring participation of both hospitals and physicians, applying administrative sanctions against both hospitals and physicians, and allowing a private cause of action only against hospitals). Burditt, therefore, does not support the creation of a right of action for patients against doctors.
 
 
 29
 Sorrells likewise does not support Mr. Baber's argument. The Sorrells court simply decided that federal courts have jurisdiction over any action that may exist against physicians under EMTALA. 733 F.Supp. at 1192-93. The court did question, in dicta, whether Congress intended to allow an individual to bring suit against a physician but limit recovery of any civil monetary penalty to the Secretary of Health and Human Services. 733 F.Supp. at 1194. This dictum, however, confuses administrative enforcement proceedings and monetary penalties with personal injury actions and civil damages. Unlike the Sorrells court, we refuse to second-guess Congressional intent.
 
 
 30
 Mr. Baber also argues that a private cause of action against physicians would strengthen enforcement of EMTALA. While this may be true, it is not our role to rewrite legislation passed by Congress. When a statute is clear and unambiguous, we must apply its terms as written instead of varying its terms to accommodate a perceived legislative intent. See Iselin v. United States, 270 U.S. 245, 250-51, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926) (supplying alleged omissions in statutes transcends the judicial function) (quoted with approval in West Virginia Univ. Hosp., Inc. v. Casey, --- U.S. ----, ----, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991)).
 
 
 31
 The clear language of EMTALA, supported by its legislative history, provides no basis for a patient to recover personal injury damages from her physician. Therefore, the district court properly granted summary judgment and dismissed the EMTALA claims against Dr. Kline and Dr. Whelan.
 
 IV.
 
 32
 Mr. Baber also alleges that RGH, acting through its agent, Dr. Kline, violated several provisions of EMTALA. These allegations can be summarized into two general complaints: (1) RGH failed to provide an appropriate medical screening to discover that Ms. Baber had an emergency medical condition as required by 42 U.S.C.A. § 1395dd(a); and (2) RGH transferred Ms. Baber before her emergency medical condition had been stabilized, and the appropriate paperwork was not completed to transfer a non-stable patient as required by 42 U.S.C.A. §§ 1395dd(b) & (c). Because we find that RGH did not violate any of these EMTALA provisions, we affirm the district court's grant of summary judgment to RGH.
 
 A.
 
 33
 Mr. Baber first claims that RGH failed to provide his sister with an "appropriate medical screening". He makes two arguments. First, he contends that a medical screening is only "appropriate" if it satisfies a national standard of care. In other words, Mr. Baber urges that we construe EMTALA as a national medical malpractice statute, albeit limited to whether the medical screening was appropriate to identify an emergency medical condition. We conclude instead that EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients and that Mr. Baber has failed to proffer sufficient evidence showing that RGH did not do so. Second, Mr. Baber contends that EMTALA requires hospitals to provide some medical screening. We agree, but conclude that he has failed to show no screening was provided to his sister.
 
 
 34
 The requirement that hospitals provide "an appropriate medical screening" is found in § 1395dd(a):
 
 
 35
 In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under [Medicare] comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
 
 
 36
 (Emphasis added.) While this section requires a hospital's emergency department to provide an "appropriate medical screening examination," it does not define that term other than to state its purpose is to identify an "emergency medical condition." See Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 271 (6th Cir.1990) (referring to "appropriate" as "one of the most wonderful weasel words in the dictionary").
 
 
 37
 EMTALA specifically defines "an emergency medical condition" as:
 
 
 38
 a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--(i) placing the health of the individual ... in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.
 
 
 39
 42 U.S.C.A. § 1395dd(e)(1)(A) (emphasis added). Thus, the goal of "an appropriate medical screening examination" is to determine whether a patient with acute or severe symptoms has a life threatening or serious medical condition. The plain language of the statute requires a hospital to develop a screening procedure[6] designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints.
 
 
 40
 We recognize that application of the procedure necessarily requires the exercise of medical training and judgment. Hospital personnel must assess a patient's signs and symptoms and use their informed judgment to determine whether a critical condition exists. Thus, while EMTALA requires a hospital emergency department to apply its standard screening examination uniformly, it does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening.[7]
 
 
 41
 The statutory language clearly indicates that EMTALA does not impose on hospitals a national standard of care in screening patients. The screening requirement only requires a hospital to provide a screening examination that is "appropriate" and "within the capability of the hospital's emergency department," including "routinely available" ancillary services. 42 U.S.C.A. § 1395dd(a). This section establishes a standard which will of necessity be individualized for each hospital, since hospital emergency departments have varying capabilities. Had Congress intended to require hospitals to provide a screening examination which comported with generally accepted medical standards, it could have clearly specified a national standard. Nor do we believe Congress intended to create a negligence standard based on each hospital's capability. EMTALA is no substitute for state law medical malpractice actions. See 42 U.S.C.A. § 1395dd(f) (EMTALA does not preempt state law, except to the extent state law directly conflicts with this statute).
 
 
 42
 Congress enacted EMTALA to address its concern with preventing patient dumping. H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 5, (1986) reprinted in 1986 U.S.C.C.A.N. 579, 726; 131 Cong.Rec. H9503 (Oct. 31, 1985); 131 Cong.Rec. S13903 (Oct. 23, 1985). The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an "adequate first response to a medical crisis" for all patients and "send a clear signal to the hospital community ... that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress." 131 Cong.Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger).
 
 
 43
 We note that other jurisdictions faced with this issue have reached the same conclusion and have rejected a medical malpractice standard in favor of an individualized standard. In Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C.Cir.1991), the D.C. Circuit held that a hospital provides an appropriate medical screening if it "conforms in its treatment of a particular patient to its standard screening procedures." The court in Gatewood also concluded a hospital would be liable for any deviation from its standard screening, regardless of its motivation. Id.
 
 
 44
 The Sixth Circuit has also held that an appropriate medical screening means "a screening that the hospital would have offered to any paying patient" or at least "not known by the provider to be insufficient or below their own standards." Cleland, 917 F.2d at 268, 271.[8] In addition, several district courts have defined an "appropriate medical screening" in a similar fashion. See Jones, 786 F.Supp. at 544 ("appropriate medical screening" is "not designed to redress an incorrect diagnosis by a hospital; instead, it is merely an entitlement to receive the same treatment that is accorded to others similarly situated"); Deberry v. Sherman Hosp. Ass'n, 769 F.Supp. 1030, 1033 (N.D.Ill.1991) (quoting Gatewood, 933 F.2d at 1041); Petrovics v. Prince William Hosp. Corp., 764 F.Supp. 415, 417 (E.D.Va.1991) (quoting Cleland, 917 F.2d at 271).
 
 
 45
 We reject Mr. Baber's suggestion that a failure to diagnose an emergency medical condition violates EMTALA because the statute was designed to create a federal malpractice statute that would nationalize standards of care in the emergency departments of participating hospitals. We believe that extends Congressional intent too far and would necessarily and unduly conflict with state tort laws. Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery. Likewise, the liability of a hospital for the tortious actions (or inactions) of its personnel should be resolved under those same principles.
 
 
 46
 Therefore, we hold that a hospital satisfies the requirements of § 1395dd(a) if its standard screening procedure is applied uniformly to all patients in similar medical circumstances.
 
 B.
 
 47
 Applying our interpretation of section (a) of EMTALA, we must next determine whether there is any genuine issue of material fact regarding whether RGH gave Ms. Baber a medical screening examination that differed from its standard screening procedure.[9] Because Mr. Baber has offered no evidence of disparate treatment, we find that the district court did not err in granting summary judgment.
 
 
 48
 Mr. Baber does not allege that RGH's emergency department personnel treated Ms. Baber differently from its other patients. Instead, he merely claims Dr. Kline did not do enough accurately to diagnose her condition or treat her injury. Although evidence challenging the adequacy of a screening examination may be sufficient to withstand summary judgment in a medical malpractice action, it is not sufficient to establish an EMTALA violation under § 1395dd(a). The critical element of an EMTALA cause of action is not the adequacy of the screening examination but whether the screening examination that was performed deviated from the hospital's evaluation procedures that would have been performed on any patient in a similar condition.
 
 
 49
 The record is clear that Ms. Baber was initially screened and evaluated in RGH's emergency department. A history of complaints was taken from the patient and her brother. Her vital signs were obtained, and all bodily systems were reviewed and examined. In addition, laboratory tests were performed. After Ms. Baber's fall, her seizure was observed and documented, her vital signs were rechecked, she was observed for focal neurological signs and symptoms, and her regular treating physician was consulted.
 
 
 50
 Dr. Kline testified that he performed a medical screening on Ms. Baber in accordance with standard procedures for examining patients with head injuries. He explained that generally, a patient is not scheduled for advanced tests such as a CT scan or x-rays unless the patient's signs and symptoms so warrant. While Ms. Baber did exhibit some of the signs and symptoms of patients who have severe head injuries, in Dr. Kline's medical judgment these signs were the result of her pre-existing psychiatric condition, not the result of her fall. He, therefore, determined that Ms. Baber's head injury was not serious and did not indicate the need at that time for a CT scan or x-rays. In his medical judgment, Ms. Baber's condition would be monitored adequately by the usual nursing checks performed every fifteen minutes by the psychiatric unit staff at BARH. Although Dr. Kline's assessment and judgment may have been erroneous and not within acceptable standards of medical care in West Virginia, he did perform a screening examination that was not so substandard as to amount to no examination. No testimony indicated that his procedure deviated from that which RGH would have provided to any other patient in Ms. Baber's condition.
 
 
 51
 Mr. Baber attempts to demonstrate a genuine issue of material fact by presenting an affidavit from Dr. B.A.K. Chhibber, a physician licensed to practice in West Virginia. In his affidavit, Dr. Chhibber stated:I am of the opinion that good medical care and appropriate medical care required the emergency room physician at Raleigh General Hospital, within a reasonable time after Brenda Baber fell, to perform a neurological exam, obtain an x-ray and obtain a CT scan.
 
 
 52
 (J.A. at 40.) While Dr. Chhibber's cursory affidavit may create an issue with regard to whether Dr. Kline's treatment of Ms. Baber deviated from accepted medical standards of care, it does not create a material question of fact as to whether Dr. Kline examined Ms. Baber differently from any other patient with a similar history, signs, and symptoms. In fact, Dr. Chhibber does not specify what is included within a neurological examination or that Dr. Kline failed to provide such an examination. He differentiated between a neurological examination and obtaining an x-ray and CT scan, but only stated that the x-ray and CT scan should be performed "within a reasonable time," a period he did not specify. More important, Dr. Chhibber did not state that his requirements for good and appropriate medical care corresponded with or deviated from RGH's standard medical screening examination. Absent such a showing, his affidavit did not address the essential issue of whether Ms. Baber received disparate treatment.
 
 
 53
 Mr. Baber also contends that RGH's emergency department did not provide any medical screening at all. A failure to provide any screening clearly violates § 1395dd(a), even absent an allegation of disparate treatment, since a requirement to perform an appropriate medical screening necessarily requires a hospital to perform some screening. Uncontradicted evidence, however, refutes Mr. Baber's contention. RGH emergency department records document, and Mr. Baber concedes, that Dr. Kline did perform some screening examination and treated his sister's head injury.
 
 
 54
 While Mr. Baber stated that he did not observe Dr. Kline examine his sister either before suturing her wound or before transferring her to BARH, his testimony as a whole is insufficient to present a genuine issue as to whether Dr. Kline actually performed a screening examination on Ms. Baber or that she was examined disparately. Mr. Baber admitted that he did not maintain a constant vigil over his sister while she waited to be transferred and that he was not always in a position to observe Dr. Kline's actions. Mr. Baber could not testify as to what Dr. Kline did or did not do when Mr. Baber was not present; his testimony was only that he did not see Dr. Kline examine his sister after suturing her wound. Such testimony is no more than mere speculation and is not sufficient to create a genuine issue of material fact. See Felty, 818 F.2d at 1128.
 
 
 55
 Moreover, Mr. Baber is not a doctor and is not qualified to evaluate whether Dr. Kline's actions constitute a medical screening examination. See Fitzgerald v. Manning, 679 F.2d 341, 347 (4th Cir.1982) (medical testimony must be given by a person who is familiar with the standard of skill and care required by practitioners in the relevant field and community). Although he may testify about his personal observations, such as whether Dr. Kline sutured his sister's wound, his testimony alone is not sufficient to establish whether or not Dr. Kline performed any medical screening for neurological problems. Therefore, Mr. Baber's allegation that Dr. Kline did not perform any screening, without more, does not meet his burden of production on a summary judgment motion.
 
 
 56
 The essence of Mr. Baber's argument is that the extent of the examination and treatment his sister received while at RGH was deficient. While Mr. Baber's testimony might be sufficient to survive a summary judgment motion in a medical malpractice case, it is clearly insufficient to survive a motion for summary judgment in an EMTALA case because at no point does Mr. Baber present any evidence that RGH deviated from its standard screening procedure in evaluating Ms. Baber's head injury. Therefore, the district court properly granted RGH summary judgment on the medical screening issue.
 
 C.
 
 57
 Mr. Baber also asserts that RGH inappropriately transferred his sister to BARH. EMTALA requires that a hospital which has determined that a patient has an "emergency medical condition" must stabilize the patient before transferring her to another facility. 42 U.S.C.A. § 1395dd(c). If the hospital knows the patient has an emergency medical condition that is unstable and does not provide stabilizing treatment, the hospital may only transfer the patient if it first obtains the patient's consent or completes a certificate indicating the transfer will be beneficial to the patient and is appropriate.[10] Id. § 1395dd(c). EMTALA's transfer requirements do not apply unless the hospital actually determines that the patient suffers from an emergency medical condition. Cleland, 917 F.2d at 271; see also H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. at 726. Accordingly, to recover for violations of EMTALA's transfer provisions, the plaintiff must present evidence that (1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) prior to transfer of an unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures.
 
 
 58
 Although Ms. Baber's tragic death indicates that her condition at some point in time was an emergency medical condition as defined in the statute, the record is not clear when. Analysis by hindsight is not sufficient to impose liability under EMTALA. Mr. Baber failed to demonstrate that RGH knew Ms. Baber had an emergency medical condition at the time she was transferred to BARH.
 
 
 59
 Mr. Baber argues that requiring a plaintiff to prove the hospital had actual knowledge of the patient's emergency medical condition would allow hospitals to circumvent the purpose of EMTALA by simply requiring their personnel to state in all hospital records that the patient did not suffer from an emergency medical condition. Because of this concern, Mr. Baber urges us to adopt a standard that would impose liability upon a hospital if it failed to provide stabilizing treatment prior to a transfer when the hospital knew or should have known that the patient suffered from an emergency medical condition.
 
 
 60
 The statute itself implicitly rejects this proposed standard. Section 1395dd(b)(1) states the stabilization requirement exists if "any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition." (emphasis added). Thus, the plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital staff. See also Gatewood, 933 F.2d at 1041 (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); Cleland, 917 F.2d at 271 ("[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition"); Thornton v. Southwest Detroit Hosp., 895 F.2d 1131, 1134 (6th Cir.1990) (EMTALA requires hospitals to give stabilizing treatment "[o]nce a patient is found to suffer from an emergency medical condition"); Coleman v. McCurtain Memorial Medical Mgt., Inc., 771 F.Supp. 343, 346 (E.D.Okla.1991) ("a plain reading of the Act dictates that the provisions concerning stabilization and transfer are implicated only after the hospital determines that an emergency medical condition exists").
 
 
 61
 Mr. Baber failed to present any evidence that RGH had actual knowledge that Ms. Baber suffered from an emergency medical condition. Dr. Kline stated in his affidavit that Ms. Baber's condition was stable prior to transfer and that he did not believe she was suffering from an emergency medical condition. While Mr. Baber testified that he believed his sister suffered from an emergency medical condition at transfer, he did not present any evidence beyond his own belief that she actually had an emergency medical condition or that anyone at RGH knew that she suffered from an emergency medical condition. In addition, we note that Mr. Baber's testimony is not competent to prove his sister actually had an emergency medical condition since he is not qualified to diagnose a serious internal brain injury. See Fitzgerald, 679 F.2d at 347 (medical testimony must be given by a person who is familiar with the standard of skill and care required by practitioners in the relevant field and community).
 
 
 62
 Because Mr. Baber failed to present any evidence that RGH knew she had an emergency medical condition at the time of her transfer to BARH, we need not inquire further into whether she was stabilized prior to her transfer. Therefore, we hold that the district court correctly granted RGH summary judgment on Mr. Baber's claim that it transferred Ms. Baber in violation of EMTALA.[11]
 
 V.
 
 63
 Finally, Mr. Baber contends that BARH violated its duties under EMTALA by failing to perform an appropriate medical screening upon Ms. Baber's admittance to its psychiatric unit. Mr. Baber premises his argument on his belief that EMTALA required BARH to provide an appropriate medical screening to all patients, whether they sought treatment from the emergency department or were directly admitted to another department in the hospital.
 
 
 64
 Again, we find that the language of EMTALA does not support Mr. Baber's argument. Section 1395dd(a) provides, in pertinent part, "if any individual ... comes to the emergency department ... the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department" (emphasis added). Thus, the hospital's duty to provide an appropriate medical screening arises only if the patient seeks treatment from the emergency department.
 
 
 65
 It is undisputed that Ms. Baber did not present herself to BARH's emergency department for treatment. Upon transfer from RGH, Dr. Whelan admitted Ms. Baber directly to the psychiatric ward of BARH without first attending to her in BARH's emergency department. Therefore, no facts support Mr. Baber's claim against BARH.[12]
 
 
 66
 Despite the clear language of the statute, Mr. Baber requests that we expand the hospital's duty under § 1395dd(a) in order to best effectuate EMTALA's purpose. Specifically, Mr. Baber asks us to require that hospitals provide an appropriate medical screening to all patients seeking treatment from any section or department of a hospital. We decline to accept Mr. Baber's invitation to change the plain language of the statute because, as we stated previously, to do so would "transcend our judicial function." Iselin, 270 U.S. at 250-51, 46 S.Ct. at 250.
 
 VI.
 
 67
 Because neither RGH nor BARH is liable under EMTALA, it is axiomatic that their parent corporations are not liable either. Therefore, we also affirm the district court's grant of summary judgment for the parent corporations.
 
 VII.
 
 68
 EMTALA is designed to require hospitals to treat patients with emergency medical conditions by requiring hospitals to provide all patients with a basic evaluation to determine whether the patient has a serious or life threatening condition. While Ms. Baber's condition may have been misdiagnosed originally, there is no evidence demonstrating that the hospitals or physicians failed to treat her. Dr. Kline treated Ms. Baber for what he perceived to be her medical condition. RGH transferred Ms. Baber to BARH because its personnel did not determine that she had "an emergency medical condition" and believed she could best be treated at that facility. Whether any of the defendants acted negligently is a question of medical malpractice which may be addressed in a state court action. It is enough for purposes of EMTALA that none of the evidence demonstrates an attempt by RGH or BARH to "dump" Ms. Baber; instead hospital personnel treated her for what they perceived to be her medical condition. Therefore, the district court's judgment is affirmed.
 
 
 69
 AFFIRMED.
 
 
 
 [1]
 EMTALA, commonly known as the Anti-Patient Dumping Act, was enacted as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 100 Stat. 82 (1986) (codified in various places in Title 42 of the U.S.C.A.). "Patient dumping" refers to the practice of a hospital that, despite its capability to provide needed medical care, either refuses to see or transfers a patient to another institution because of the patient's inability to pay. Congress sought to end patient dumping by requiring any hospital receiving federal funds to examine patients who seek treatment in an emergency department and treat any serious medical condition detected. See Melissa K. Stull, Annotation, Construction and Application of Emergency Treatment and Active Labor Act (42 USCS § 1395dd), A.L.R.Fed. 166, 175 (1991)
 As the name of the statute implies, EMTALA also concerns the treatment of women in active labor. None of these provisions are relevant to the present appeal.
 
 
 [2]
 Mr. Baber also alleged that the Defendants violated their duties under state negligence and medical malpractice tort law. After dismissing Mr. Baber's EMTALA theories of recovery, the district court dismissed without prejudice the state law claims. Because the Defendants' motions to dismiss did not address Mr. Baber's medical malpractice and negligence theories of recovery, we do not express any opinion on whether the facts support those claims. Instead, we leave that question to the West Virginia state courts
 
 
 [3]
 Dr. Whelan had most recently treated Ms. Baber in a detoxification program at BARH two months earlier, which she discontinued against his medical advice
 
 
 [4]
 A participating hospital is defined as a "hospital that has entered into a provider agreement under section 1395cc of this title." 42 U.S.C.A. § 1395dd(e)(2)
 
 
 [5]
 The provision allowing civil enforcement for personal injury reads as follows:
 Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.
 42 U.S.C.A. § 1395dd(d)(2)(A) (emphasis added).
 
 
 [6]
 While a hospital emergency room may develop one general procedure for screening all patients, it may also tailor its screening procedure to the patient's complaints or exhibited symptoms. For example, it may have one screening procedure for patients suffering a heart attack and another for women in labor. Under our interpretation of EMTALA, such varying screening procedures would not pose liability under EMTALA as long as all patients complaining of the same problem or exhibiting the same symptoms receive identical screening procedures. We also recognize that the hospital's screening procedure is not limited to personal observation and assessment but may include available ancillary services through departments such as radiology and laboratory
 
 
 [7]
 Some commentators have criticized defining "appropriate" in terms of the hospital's medical screening standard because hospitals could theoretically avoid liability by providing very cursory and substandard screenings to all patients, which might enable the doctor to ignore an emergency medical condition. See, e.g., Karen I. Treiger, Note, Preventing Patient Dumping: Sharpening the COBRA's Fangs, 61 N.Y.U.L.Rev. 1186 (1986). Even though we do not believe it is likely that a hospital would endanger all of its patients by establishing such a cursory standard, theoretically it is possible. Our holding, however, does not foreclose the possibility that a future court faced with such a situation may decide that the hospital's standard was so low that it amounted to no "appropriate medical screening." We do not decide that question in this case because Ms. Baber's screening was not so substandard as to amount to no screening at all
 
 
 [8]
 The one distinction between the tests used by the Sixth and D.C. Circuits is that the D.C. Circuit would impose liability for any disparate treatment, regardless of the hospital's motive, Gatewood, 933 F.2d at 1041, while the Sixth Circuit will only impose liability if the hospital had a bad motive in providing the disparate treatment, Cleland, 917 F.2d at 272. For the Sixth Circuit, such bad motives for the disparate treatment might include the patient's indigence, drunkenness, political affiliations, or medical condition, such as AIDS. 917 F.2d at 272. In this case, we are not required to decide which view is correct since Mr. Baber did not make any allegation of disparate treatment
 
 
 [9]
 RGH argues we need not proceed further because Mr. Baber concedes that Dr. Kline performed an appropriate medical screening for her initial complaint upon her arrival at the emergency department. Mr. Baber counters by asserting that an emergency department has a duty to provide an additional screening if additional symptoms or a new unrelated injury occurs while the patient is in the emergency department. For purposes of this opinion, we assume that EMTALA applies where an injury occurred while the patient was in the emergency department and that injury required medical attention. We decline to decide, however, the extent of a hospital's duty under EMTALA to provide additional screening examinations for new symptoms that first appear after initial evaluation and treatment but prior to discharge from the emergency department
 
 
 [10]
 Under EMTALA, a physician must certify that the medical benefits to be gained by the transfer outweigh the possible risks of the transfer. 42 U.S.C.A. § 1395dd(c)(1)(A)(ii). An appropriate transfer is one where the facility receiving the patient has available space and qualified personnel for treatment of the patient and has agreed to accept the patient, the transferring hospital provides the receiving hospital with the patient's medical records, and the transfer is effected through qualified personnel and emergency equipment. Id. § 1395dd(c)(2)
 
 
 [11]
 We need not address Mr. Baber's allegations that RGH failed to provide proper certification or acquire the Babers' permission for the transfer since those provisions do not apply unless RGH knew of Ms. Baber's emergency medical condition and that her condition had not been stabilized
 
 
 [12]
 We do not intend to imply that EMTALA is necessarily invoked when a patient is examined in the emergency room by her physician prior to admission. As we discussed above, the purpose of EMTALA is to see that patients receive emergency treatment when they are in serious distress