Richard PAGAN PAGAN,
et al., Plaintiffs,

v.

HOSPITAL SAN PABLO, INC.,
et al., Defendants.

No. Civ. 99–1681(JP).

United States District Court,
D. Puerto Rico.

May 4, 2000.

Pedro Gavillan Morales, San Juan, PR, for plaintiff.

Angel R. De Corral Julia, De Corral & De Mier, San Juan, PR, for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

## I. INTRODUCTION

The Court has before it Defendant Hospital San Pablo's Motion for Summary Judgment (**docket No. 35**) and Plaintiffs' Opposition thereto (docket No. 37). For the reasons that follow the Court hereby **GRANTS** the motion at bar and **DISMISSES** the instant case.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment serves to "assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, a summary judgment is in order when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, [in this case Plaintiff,] reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suarez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First National Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Insurance Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir. 1989). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a summary judgment motion, the movants, in this case Defendants, bear the initial burden of "informing the district court of the basis for their motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the movant does not bear the burden of proof at trial, it must show that no reasonable fact-finder could find that the non-movant, in this case Plaintiff, has established the requisite elements of its claim. *Id.* at 325, 106 S.Ct. 2548. Once the moving party meets his burden of proof, the burden shifts to the non-movant, who may not "rest upon mere allegations or denials of ... the pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." *Goldman*, 985 F.2d at 1116; *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In view of this standard and after studying the documents attached to the parties' briefs, the following facts are uncontested.

## III. UNCONTESTED FACTS

1. On January 2, 1999, Co–Plaintiff Waleska Torres ("Torres") gave birth to a baby boy named Jared Pagán Torres ("Jared"), at Hospital San Pablo ("San Pablo") in Bayamón, Puerto Rico, a hospital subject to the provisions of the Emergency Medical Treatment and Active Labor Act ("EMTALA") 42 U.S.C. § 1395dd.

2. Torres and Jared were discharged from San Pablo in good condition on January 4, 1997 at 10:50 a.m.

3. On January 4, 1997 at 11:36 p.m., Jared was brought to the San Pablo's Emergency Room.

4. At the emergency room, Torres stated that the baby had a bluish color since 7:00 p.m. and was "weak since 5:00 p.m."

5. At 11:45 p.m., Dr. Ernesto Toledo examined Jared and found that he was in respiratory distress and was cyanotic.

6. Jared was diagnosed with an acute broncho spasm and cyanosis.

7. At 11:50 p.m., Jared's vital signs were taken. Dr. Ernesto Toledo examined Jared in the Emergency Room. He administered an I.V. and .10 milliliters of aminophylline. An x-ray was taken of Jared's chest.

8. At 11:52 p.m., a call was placed to Dr. Bosch, Jared's pediatrician who treated him on January 2, 1997.

9. At 12:00 a.m., Jared was placed on a cardiac monitor.

10. At 12:50 a.m., Jared went into cardiorespiratory arrest. At about this time, the neonatal intensive care unit team was notified for assistance with an intubation. Ms. Meléndez and Ms. Fernández administered respiratory therapy to Jared. Jared was hypothermic and cyanotic.

11. At 12:55 a.m., Jared was referred to the ENGT. A white liquid (30 cc) was extracted from Jared's lungs. Hot pads were administered to no avail to relieve hypothermia. A blood sample was attempted to no avail. Jared was placed on a ventilator. Jared did not respond to this treatment. CPR was initiated with cardiac massage.

12. At 1:00 a.m., two dosages of epinephrine (0.3 cc) were administered through the endocrinal tube.

13. At 1:03 a.m., atropine was administered.

14. At 1:04 a.m., a third dosage of epinephrine was administered.

15. At 1:06 a.m., a fourth dosage of epinephrine was administered through the endocrinal tube.

16. At 1:08 a.m., a second dosage of atropine (0.3 cc) was administered.

17. At 1:12 a.m., a fifth dosage of epinephrine (0.3 cc) was administered through the endocrinal tube.

18. At 1:15 a.m., a third and final dosage of atropine (0.3 cc) was administered.

19. Jared did not respond to medical therapy or CPR.

20. At 1:20 a.m., Dr. Caprieles ordered treatment and CPR terminated. Patient Jared was hypothermic and cyanotic without vital signs. He was declared dead, and tubes, cardiac monitor, and I.V. were disconnected.

## IV. DISCUSSION

■ The Emergency Medical Treatment and Active Labor Act, better known by its acronym, "EMTALA," imposes three duties which "reside in three principal statutory silos." *See Lopez–Soto v. Hawayek,* 175 F.3d 170, 172 (1st Cir.1999). The first duty, codified in subsection (a) of the statute, requires that covered hospitals perform "an appropriate medical screening examination" on "any individual" who comes to an emergency department for treatment. 42 U.S.C. § 1395dd(a). The duty to screen applies only in cases of individuals who arrive at the hospital's emergency room. *See Lopez–Soto,* 175 F.3d at 173.

■ The duty to stabilize patients with emergency conditions and the process of transferring them are set forth in subsections (b) and (c), respectively. Unlike the duty to screen, the duty to stabilize will arise regardless of whether or not the patient appeared at the emergency room. *See id.* ("Nothing in the subsection's test suggests a necessary relationship between a hospital's obligations [to stabilize] and the identity of the department within the hospital to which the afflicted individual presents himself.") The duty to stabilize is triggered if the patient arrives at the hospital and the hospital determines that the patient has an *emergency medical condition. See* 42 U.S.C. § 1395dd(b) (emphasis added). Subsection 1395dd(c) states that "[i]f an individual at a hospital has an emergency medical condition, which has not been stabilized ..., the hospital may not transfer the individual" less certain established conditions are met. A plaintiff seeking to show a violation of subsections (b) or (c) must show that the hospital had *actual knowledge* of his or her emergency medical condition. *See Urban v. King,* 43 F.3d 523, 525–26 (10th Cir. 1994); *Baber v. Hospital Corp. of America,* 977 F.2d 872, 883 (4th Cir.1992); *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 270 (6th Cir.1990). Actual knowledge is not required, however, to show a violation of subsection (a), because screening usually precedes a conclusion that an emergency condition exists. It would be illogical to require actual knowledge if the violation resulted from the deficient screening which prevented the hospital from actually learning of the emergency condition.

Because it is uncontested that no transfer was made in the instant case, the Court shall focus on subsections (a) and (b). Furthermore, because the duty to screen under subsection (a) is triggered only in the case of a patient's arrival at the emergency room, the hospital's duty to screen will only apply when Jared arrived at the emergency room on January 4, 1997 at 11:36 p.m.

■ The uncontested evidence also shows that at the time of his release during the morning hours of January 4, 1997, the hospital had no actual knowledge that Jared was in an emergency condition. In fact, it is uncontested that Jared was released from San Pablo in good condition. Therefore, the hospital did not breach its duty to stabilize Jared before releasing him on the morning of January 4, 1997, and any liability under EMTALA would hinge on determining whether or not the hospital breached its duty when it treated

Jared upon his return to the emergency room that night.

■ Jared was suffering from an emergency condition upon his arrival at the emergency room. Subsection 1395dd(e)(1) defines "emergency medical condition" as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part." Under this definition, a patient will suffer from an emergency medical condition if he is in "imminent danger of death or serious disability." *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir.1990). Once it is established that a patient appeared at a hospital's emergency department with an emergency medical condition, the hospital would be liable under EMTALA either if it fails to detect the nature of the emergency condition as a result of an inadequate screening or, if the hospital detects the emergency condition, by failing to stabilize the condition prior to releasing the plaintiff. *See Deberry v. Sherman Hosp. Ass'n*, 741 F.Supp. 1302, 1305 (N.D.Ill.1990).

■ In the instant case, San Pablo concedes that upon his arrival at the emergency room, Jared presented an emergency condition and that the medical staff knew of this condition. Therefore, the question is whether San Pablo failed to stabilize Jared's emergency condition prior to releasing him. The duty to stabilize means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). In this case, however, Jared was not released or transferred, but rather died before a transfer or release was ordered. Therefore, Jared's death while being treated at San Pablo precludes the possibility of EMTALA liability as no transfer or release was ordered prior to being stabilized.

■ Although the Fourth Circuit has recognized that a transfer is not necessary to establish a breach of EMTALA's duty to stabilize, the instant case is distinguishable from the case in which the Fourth Circuit made such pronouncement. *See In Matter of Baby "K"*, 16 F.3d 590, 597 (4th Cir.1994). The *Baby K* Court reasoned that limiting the scope of EMTALA to actual transfers or releases would result in hospitals simply refusing to transfer or release the patient to circumvent the duty to stabilize. This statement is consistent with the First Circuit's observation that dumping may be actual or constructive. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1193 (1st Cir.1995). However, Plaintiff is not alleging that Jared was constructively dumped. It is uncontested that Jared died as he was being treated and there is no evidence on the record suggesting that his treatment had stopped before his death. In this way, the instant case is factually distinguishable from *Correa* where Defendant's staff blithely ignored the patient. *See id.* at 1189. The case at bar is simply a garden variety medical malpractice case. EMTALA is not the federal counterpart of a state medical malpractice suit and cannot serve as a means to pry open the doors of the federal court.

In conclusion, the Court hereby **DISMISSES** Plaintiffs' EMTALA claims **WITH PREJUDICE.** In view that the all federal question claims are dismissed, the Court hereby **DISMISSES WITHOUT PREJUDICE** Plaintiffs' state medical malpractice claims.

**IT IS SO ORDERED.**