Robert BROOKS, Plaintiff–Appellant,

v.

MARYLAND GENERAL HOSPITAL, INCORPORATED; John Doe Morritts; Hassan A. Ghandour; M. Floan; Allan Genut; David M. Cook; University of Maryland Medical System, Incorporated; Michael Salcman; D. Griffith, Defendants–Appellees.

No. 92–1852.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1993.

Decided June 21, 1993.

Mark Eric Herman, Baltimore, MD, argued, for plaintiff-appellant.

Jeffrey Grant Cook, Miles & Stockbridge, Towson, MD, argued (Ronald U. Shaw, Miles & Stockbridge, Towson, MD, Donald L. De-Vries, Jr., Susan T. Preston, Goodell, DeVries, Leech & Gray, Patti Gilman West, Smith, Somerville & Case, Baltimore, MD, on the brief), for defendants-appellees.

Before PHILLIPS and NIEMEYER, Circuit Judges, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

Complaining of acute weakness and a sudden inability to walk, Robert Brooks presented himself at the emergency room of Maryland General Hospital in Baltimore on October 5, 1989, at 2:00 in the afternoon. At the time he had no medical insurance. Over six hours later he was first examined but received no treatment or evaluation; three and one-half hours later, he was transferred to the University of Maryland Medical System's emergency room; and three hours still later, at approximately 3:15 the following morning, he was given a pan-myelogram and a CAT scan. Medical personnel were not able to read the results of the CAT scan for three days due to technical difficulties. Brooks claims that the delay caused by the refusal of both hospitals and their professional personnel to diagnose and stabilize his condition caused him permanent spinal cord damage, requiring surgery and lengthy rehabilitation.

Brooks brought suit against both hospitals and the responsible professionals [1] alleging a claim under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (imposing on hospitals with emergency rooms duties to screen all individuals coming to the emergency room for emergency medical conditions and to stabilize any emergency medical condition found). The defendants moved to dismiss the complaint because Brooks had not first sought arbitration of his claims as mandated by the Maryland Health Care Malpractice Claims Act (the Maryland Malpractice Act), Md.Cts. & Jud.Proc.Code Ann. § 3–2A–01, *et seq.* The district court granted defendants' motion, holding that Brooks' claims are covered by the requirements of the Maryland Malpractice Act and accepting defendants' argument that EMTALA did not preempt state

---

1. Brooks' complaint named as defendants, in addition to the two hospitals, John Doe Morritts, M.D.; Hassan A. Ghandour, M.D.; M. Floan, R.N.; Allan Genut, M.D.; David M. Cook, M.D.; Michael Salcman, M.D.; and D. Griffith, M.D.

law requirements for arbitration. This appeal followed.

■ We must now decide a case of first impression and determine whether a plaintiff seeking relief under EMTALA must first pursue arbitration required by state law for medical malpractice claims. While we question whether any state law, substantive or procedural, can defeat a federally created cause of action absent some express or implied incorporation of the state law in the federal act, we conclude that a claim under EMTALA would not in any event be within the scope of the Maryland Malpractice Act and therefore would not need to be arbitrated in accordance with its terms. We vacate the judgment in favor of the hospitals only and remand the claims against them for further proceedings. The dismissals of the claims against the individual defendants are affirmed.[2]

I

■ EMTALA was passed by Congress in 1986 in response to a growing concern that hospitals were "dumping" patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized. The Act was not designed to provide a federal remedy for misdiagnosis or general malpractice. Rather, Congress expressed concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency. Under traditional state tort law, hospitals are under no legal duty to provide this care. Accordingly, Congress enacted EMTALA to require hospitals to continue to provide it.

■ EMTALA imposes two duties on every hospital that has both a medicare provider agreement with the Secretary of Health and Human Services and an emergency room or department: (1) to provide to anyone presented for treatment "an appropriate medical screening ... to determine whether or not an emergency medical condition ... exists," and (2) to stabilize the condition or, if medically warranted, to transfer the person to another facility if the benefits of transfer outweigh its risks. *See* 42 U.S.C. § 1395dd(a)-(c).[3] A person injured by a breach of these duties may recover "those damages available for personal injury under the law of the State in which the hospital is located." 42 U.S.C. § 1395dd(d)(2)(A).

■ Although the duty to screen is imposed only within the hospital's capabilities, the hospital must apply its standard of screening *uniformly* to all emergency room

---

**2.** Section 1395dd(d)(2)(A) of Title 42 of the United States Code limits private civil actions under EMTALA, providing remedies only against hospitals. *See Baber v. Hospital Corp. of America*, 977 F.2d 872, 876 (4th Cir.1992). At oral argument Brooks conceded that his EMTALA claim was not properly lodged against the individual defendants. Although the district court dismissed the claims against them for other reasons, we affirm that judgment for the reasons here given.

**3.** The Act provides in pertinent part:

(a) In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(b)(1) If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

\*     \*     \*     \*     \*     \*

(c)(1) If an individual at a hospital has an emergency medical condition which has not been stabilized ..., the hospital may not transfer the individual unless—

\*     \*     \*     \*     \*     \*

[(A)](ii) a physician ... has signed a certification that, based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ... and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

patients, regardless of whether they are insured or can pay.[4] The Act does not impose any duty on a hospital requiring that the screening result in a correct diagnosis. We have noted previously that EMTALA is not a malpractice statute and its "avowed purpose ... was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care." *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992). Rather, Congress deliberately left the establishment of malpractice liability to state law, limiting EMTALA's role to imposing on a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition discovered. *Id.* at 879; *see also Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991) ("[A]n 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures."); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 272 (6th Cir.1990) ("If [the hospital] acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute.").

In response to Brooks' complaint, which was tailored to allege solely an EMTALA claim, the defendants filed a motion to dismiss, contending that (1) EMTALA does not preempt state malpractice law, including the requirements of the Maryland Malpractice Act, and (2) the Maryland Act requires that a claimant proceed through arbitration as a condition precedent to initiating any claim against a health care provider for medical injury. Since Brooks failed to seek arbitration, the defendants contend that the district court was without jurisdiction to proceed. *See Tranen v. Aziz*, 304 Md. 605, 612, 500 A.2d 636 (1985); *cf. Jewell v. Malamet*, 322 Md. 262, 276, 587 A.2d 474 (1991) (refusing to *dismiss* case pending arbitration to prevent running of statute of limitations).

Defendants' contentions raise the unresolved issue of whether, as a matter of federal law, a state may impose arbitration as a condition precedent to filing suit under EMTALA. Before engaging that issue, however, we must determine first whether Maryland even purports to impose such a requirement for bringing claims such as the present one, a question which depends on whether Brooks' EMTALA claim is a malpractice claim under the terms of the Maryland Malpractice Act.

II

The Maryland Health Care Malpractice Claims Act was enacted in 1976, ten years before EMTALA, in response to a crisis in health care different from that later addressed by the federal statute. By the early 1970's, an increase in medical malpractice suits in Maryland and elsewhere led to an increase in malpractice insurance premiums and created concern that some health care providers, particularly those in high-risk disciplines, would not be able to continue to practice. One major insurer ceased writing medical malpractice insurance in Maryland and no new company entered Maryland to fill the void. The nature of this crisis is described in *St. Paul Fire & Marine Ins. Co. v. Insurance Commissioner*, 275 Md. 130, 133–34, 339 A.2d 291 (1975).

The Maryland legislature enacted several pieces of legislation to facilitate access to insurance by health care providers and to lessen the cost of health care. One measure was the Maryland Malpractice Act, which requires, as a condition precedent to filing a malpractice claim in court, that the claimant pursue arbitration. Although the arbitration

---

**4.** While it appears that EMTALA was enacted because of Congress' concern about the growing practice of hospitals "dumping" emergency room patients who had no insurance and could not afford to pay, the language of the Act does not require a showing that a claimant is uninsured or indigent, nor does it provide that the hospital breaches the Act's duties only when it acts with economic motives. Rather, the language of the Act imposes its duties in respect of "*any* individual" who is presented to an emergency room for examination or treatment of a medical condition. *See* 42 U.S.C. § 1395dd(a) & (b) (emphasis added); *see also* Thomas L. Stricker, Jr., Note, *The Emergency Medical Treatment & Active Labor Act: Denial of Emergency Medical Care Because of Improper Economic Motives*, 67 Notre Dame L.Rev. 1121 (1992) (reviewing the case law and suggesting that the Act be amended to require proof of economic motive).

is not binding, the legislature's purpose was "to reduce the number of medical malpractice court suits by screening out frivolous claims at the arbitration level." *Newell v. Richards,* 323 Md. 717, 732, 594 A.2d 1152 (1991); *see also Attorney General v. Johnson,* 282 Md. 274, 308, 385 A.2d 57 (1978) (the Act was intended to encourage more rapid resolution of claims and therefore to lower both costs and insurance premiums), *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978), *overruled in part on a different point in Newell v. Richards, supra.*

More specifically, the Act provides that "[a]ll claims, suits, and actions ... by a person against a health care provider for medical injury" must proceed through arbitration if the amount of damages meets the jurisdictional requirements, which is not at issue in this case. Md.Cts. & Jud.Proc.Code Ann. § 3–2A–02. The term "health care provider" is defined broadly, including, in part, hospitals, physicians, and nurses, *id.* at § 3–2A–01(e), and "medical injury" is defined as "injury arising or resulting from the rendering or failure to render health care," *id.* at § 3–2A–01(f).

Unless arbitration is waived by all parties, the malpractice claim must be filed with the Director of the Health Claims Arbitration Office, and, except in limited circumstances not applicable here, must include the certificate of an expert "attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury." *Id.* at § 3–2A–04(b)(1). Once a claim has been filed, the Director sees that it is served on the defendants and arranges for the formation of a three member panel, composed of an attorney, a health care provider, and a member of the general public, through a combination of random selection and strikes by the parties. *Id.* at § 3–2A–04. The panel determines liability and assesses damages, if any, as well as the costs of arbitration. The panel must deliver its decision to the Director within one year of the date when all defendants are served and within 10 days of the hearing. The Director must then issue an opinion within 15 days. *Id.* at § 3–2A–05(g). The parties may seek to modify the order or may reject it. A party rejecting an award may file an action in court to have the award nullified, but the award may be introduced at trial and is presumed correct. *Id.* at § 3–2A–06. If the verdict at trial is not more favorable to the party rejecting the award, costs of the judicial proceeding are assessed against the rejecting party. *Id.* at § 3–2A–06(g).

The final section of the Maryland Malpractice Act is entitled "Construction of subtitle" and provides in full, "The provisions of this subtitle shall be deemed *procedural in nature* and shall not be construed to create, enlarge, or diminish any cause of action not heretofore existing, except the defense of failure to comply with the procedures required under this subtitle." *Id.* at § 3–2A–09 (emphasis added).

■ Although the scope of the Act's language broadly covers all claims against health care providers for injury "arising or resulting from the rendering or failure to render health care," Maryland courts have limited the Act's applicability to traditional malpractice claims arising from the breach by a professional of his duty to comply with a standard of care. *See Cannon v. McKen,* 296 Md. 27, 36, 459 A.2d 196 (1983) ("We hold that the Act covers only those claims for damages arising from the rendering or failure to render health care where there has been a breach by the defendant, in his professional capacity, of his duty to exercise his professional expertise or skill."). Claims for injuries arising from other causes in connection with health care have thus been excluded from coverage of the Act. *See, e.g., id.* at 38, 459 A.2d 196 (remanding patient's claim against dentist for consideration of whether malpractice or a breach of a non-professional duty was involved where patient alleged that a piece of dental equipment fell off the wall and hit her); *Miles Laboratories, Inc. v. Doe,* 315 Md. 704, 741, 556 A.2d 1107 (1989) (holding that a claim against the Red Cross by a recipient of HIV-infected blood is not for malpractice but for the "failure to adopt proper testing and screening procedures" and therefore is not actionable under the Maryland Malpractice Act).

The limitation of the Act's scope was confirmed yet more clearly by the Maryland legislature's recent amendment to § 3–2A–02 providing that a health care provider is not liable under the Act

> unless it is established that the care given by the health care provider is not in accordance with the *standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities* at the time of the alleged act giving rise to the cause of action.

Md.Cts. & Jud.Proc.Code Ann. § 3–2A–02(c) (as amended April 13, 1993, by 1993 Md. Laws 9, § 1, (effective July 1, 1993)) (emphasis added).

Having in mind the duties imposed by EMTALA and at the same time the scope of Maryland's Medical Malpractice Act, we proceed now to determine whether the conduct that Brooks alleges as a basis for his EMTALA claim constitutes a claim for malpractice covered by the Maryland Malpractice Act, and if so, whether, as the parties debate, EMTALA preempts the state act's procedures.

### III

Brooks has made it clear by the limited scope of his complaint and by assurances made during oral argument that his claim is only for violation of EMTALA and that he has deliberately refrained from asserting a traditional malpractice claim. As we have already observed, a claim under EMTALA need only allege that (1) a hospital's emergency room failed to screen the plaintiff or did not apply the same standard of screening to the plaintiff that it applies to other patients, or (2) if the same screening standards were applied and a medical emergency was discovered, the hospital failed to stabilize the condition either by refusing to provide care or by improperly transferring the plaintiff to another facility. EMTALA does not create a standard of care to be followed, but rather accepts for purposes of the Act that standard, within the hospital's capabilities, that is applied generally by the hospital. *See* 42 U.S.C. § 1395dd(a). Stated otherwise, EMTALA does not create liability for malpractice based on a breach of national or community standard of care; at the core, it aims at disparate treatment. Therefore, to the extent that Brooks' complaint contains allegations that might suggest a broader duty under EMTALA, his right to recover is limited by EMTALA's statutory provisions.

The broader purpose of the Maryland Malpractice Act, to encourage the settlement of claims against health care providers for medical injuries before suit is filed, and its language would at first blush appear to apply to an EMTALA claim, because the EMTALA claim, broadly speaking, is a claim against a "health care provider" for "medical injury." However, the procedural requirements of the Maryland Malpractice Act and the Maryland cases interpreting it limit its applicability to traditional claims for medical malpractice where the claimant alleges that the health care provider breached a standard of care. The 1993 amendment to the Act appears to corroborate what the Maryland courts had held earlier—to state a claim under the Maryland Malpractice Act, the claimant must show that the health care provider breached a relevant standard of care, now defined to be that of the community. Moreover, in order to enter the arbitration process mandated by the Maryland Act, the claimant must be able to provide a certificate that the health care provider violated that standard of care and that a departure from it was the cause of claimant's injury. *See* Md.Cts. & Jud.Proc.Code Ann. § 3–2A–04(b)(1).

Because Brooks' EMTALA claim is aimed at disparate screening and the Maryland Malpractice Act applies only to claims that the standard of care in the community has been breached, we hold that the Maryland Malpractice Act does not apply to cover the conduct alleged as the basis for Brooks' EMTALA claim. *Cf. Miles Laboratories,* 315 Md. at 741, 556 A.2d 1107 (holding that a failure of screening for HIV-infected blood is not covered by the Maryland Malpractice Act). Therefore, he cannot be charged with responsibility for first seeking arbitration before proceeding with his EMTALA claim in court.

## IV

In the district court the defendants moved to dismiss the case for lack of subject matter jurisdiction, arguing that Brooks' failure to comply with the Maryland Malpractice Act's arbitration requirement deprived the district court of the power to act. Brooks and the defendants argued this issue, both below and on appeal, in terms of whether EMTALA "preempted" the mandated procedures of the Maryland Malpractice Act. Having been presented with the dispositive issue in this fashion, the district court held that EMTALA did not preempt the requirements of the Maryland Malpractice Act and the failure to follow those requirements defeated the federal cause of action. The court concluded therefore that it was without jurisdiction to proceed. In reaching its conclusion, the court observed that the state-mandated arbitration requirement did not conflict with the requirements of EMTALA, but rather was a state-imposed condition precedent to legal action that "has substantive aspects" and "must be honored by federal courts," relying on our decision in *Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir.1989) (in a diversity jurisdiction case a federal court presented with a medical malpractice claim under state law must honor state-mandated arbitration because of its substantive characteristics).

If Brooks had brought a claim under state law for relief arising from the same conduct of the defendants involved here, we might have to face the question of whether his claim would be preempted by EMTALA. Brooks' case, however, is not brought under diversity jurisdiction calling for the application of state law but rather is a suit for enforcement of a federally created right under federal question jurisdiction, and we are only given to decide the nature and scope of a federal cause of action.

■ A substantive state limitation may not apply *ex proprio vigore* to such an action because "[t]he elements of, and the defenses to, a federal cause of action are defined by federal law." *Howlett v. Rose*, 496 U.S. 356, 375, 110 S.Ct. 2430, 2442, 110 L.Ed.2d 332 (1990). While the federal courts may give effect to state law in interpreting the scope of a federal statute if Congress has evinced an intention to give state law persuasive or binding effect, *see Reconstruction Finance Corp. v. Beaver County*, 328 U.S. 204, 209–10, 66 S.Ct. 992, 995–96, 90 L.Ed. 1172 (1946), even when a federal statutory provision contains significant gaps, the courts have been reluctant to infer such intent and resort to reference to state law due to concern for uniformity in the nation's law. *See D'Oench, Duhme & Co., Inc. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 471–72, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J. concurring) (noting that the federal law cannot be a "juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced"). In a similar vein, the Supreme Court has held that state procedures should not be allowed to defeat a federal cause of action even when prosecuted in state court. *See Felder v. Casey*, 487 U.S. 131, 138, 108 S.Ct. 2302, 2306, 101 L.Ed.2d 123 (1988).

Thus, when defendants urged upon the district court that state-mandated arbitration was necessary, they could have done so only if they could contend that the federal statute, expressly or by implication, incorporated or tolerated the state requirement of arbitration and that the statute accepted as the sanction for failure to follow the arbitration defeat of the federal right. In the absence of the federal statute's express or implied acceptance of the state based condition for federal liability, the state conditions simply cannot be recognized as conditions precedent to the vindication of a federally created right.

The question properly presented in this case, therefore, does not ask whether state law is preempted by EMTALA, but more precisely whether federal law incorporates, expressly or impliedly, a state-mandated procedure with the attendant sanction that the federal right is defeated in the absence of compliance. And the answer to this question rests on the proper interpretation of the federal statute.

As is well documented in the legislative history of EMTALA, Congress never intended to displace state malpractice law. Rather, it expressed the expectation that it was filling a gap in the state law and imposing a

limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there. Consistent with this intent not to displace state malpractice and tort law, but only to supplement it, EMTALA provides for limited preemption:

> The provisions of this section do not preempt any State or local requirement, except to the extent that the requirement directly conflicts with the requirement of this section.

42 U.S.C. § 1395dd(f). In the same vein, EMTALA expressly adopts state-imposed limitations on damages. The Act provides:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain *those damages available for personal injury under the law of the State in which the hospital is located,* and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). Reading this section broadly, the defendants might be able to argue that state-mandated arbitration comes within its umbrella, or alternatively, within a broader penumbra of the Congressional intent to weave EMTALA duties into the fabric of state malpractice law.

In examining this question, we would have to conduct a detailed analysis inquiring whether a state-created procedure such as arbitration is inconsistent with other portions of EMTALA. We would be confronted with the question of whether the certificate required by § 3–2A–04(b)(1) of the Maryland Act, to the extent it requires an opinion that the defendants failed to comply with a generally applicable standard of care, conflicts with the different proof required under EMTALA (that a hospital applied its standard of screening in an emergency room disparately). We would also be faced with the question of whether the presumption of correctness that the Maryland Act gives to an arbitration award might conflict with the Federal Rules of Evidence and federally imposed burdens of proof. Finally, we would have to address a problem raised by at least two state court opinions, from Virginia and Indiana, which have held that state arbitration requirements conflict with EMTALA because of their adverse effect on EMTALA's statute of limitations. *See HCA Health Services of Indiana, Inc. v. Gregory,* 596 N.E.2d 974 (Ind.App.1992); *Smith v. Richmond Memorial Hosp.,* 243 Va. 445, 416 S.E.2d 689, *cert. denied,* —— U.S. ——, 113 S.Ct. 442, 121 L.Ed.2d 361 (1992). Both courts concluded that the time involved in proceeding through arbitration could result in the filing of claims after the running of EMTALA's statute of limitations, which requires that a claim be filed within two years of the date of the violation. *See* 42 U.S.C. § 1395dd(d)(2)(C). No language in EMTALA indicates that compliance with state arbitration requirements tolls the federal statute of limitations. *See HCA Health Services,* 596 N.E.2d at 977; *Smith,* 416 S.E.2d at 695.

This obviously complex question of whether EMTALA incorporates or implicitly tolerates state-mandated arbitration procedures is happily one that we need not resolve. We point out these problems only to address the contentions of the defendants and the holding of the district court that if the Maryland Act were to apply, the Maryland arbitration procedure "is not preempted" by EMTALA. In reversing the judgment of the district court in favor of the hospitals, however, we choose to do so on the basis of our ruling that the Maryland Act, even if incorporated or tolerated by EMTALA, does not cover an EMTALA claim. The cases against the hospitals, therefore, are remanded to the district court for further proceedings. As noted in footnote 2 above, the dismissal of the individual defendants is affirmed.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.*