Juanita F. **GERBER**, Plaintiff,

v.

**NORTHWEST HOSPITAL CENTER, INC., et al.,** Defendants.

**Civil No. AMD 96–2002.**

United States District Court, D. Maryland.

Oct. 31, 1996.

---

Joel G. Fradin, Towson, MD, for plaintiff.

Donald L. DeVries, Jr., Carol L. Nicolette, Goodell, DeVries, Leech & Gray, L.L.P., Baltimore, MD, Douglas Schrader, A. Gwynn Bowie, Jr., Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., Annapolis, MD, for defendants.

**MEMORANDUM**

DAVIS, District Judge.

Plaintiff, Juanita F. Gerber instituted this action against defendants Northwest Hospital Center, Inc., Capital Emergency Associates, L.L.C., and Philip N. Neustadt, M.D., alleging that the defendants' failure to address her psychiatric symptoms while she was being treated in the hospital's emergency room for certain physical complaints violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Presently before the Court are the defendants' motions to dismiss, or in the alternative, for summary judgment. As the parties have fully briefed the issues presented, no hearing is deemed necessary. Local Rule 105.6 (D.Md.1995). For the reasons set forth herein, I shall grant the defendants' motions to dismiss because plaintiff has failed to state a claim under EMTALA.

(i)

 Congress enacted EMTALA in 1986 "in response to a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v. Maryland General Hospital, Inc.*, 996 F.2d 708, 710 (4th Cir.1993). For this reason, EMTALA imposes two primary requirements on participating hospitals. First, the hospital must provide "appropriate medical screening" to anyone presented to an emergency room for treatment "to determine whether or not an emergency medical condition exists." Second, the hospital must "stabilize" any such emergency medical condition before discharging or transferring the patient to another medical facility. 42 U.S.C. § 1395dd(a)–(c); *Brooks*, 996 F.2d at 710. Congress did not, however, intend EMTALA to be a federal malpractice statute. *Id.; Bryan v. Rectors and Visitors of the Univ. of Virginia*, 95 F.3d 349, 350–52 (4th Cir. 1996); *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir.1996). Rather, its purpose was to "get patients into the system who might otherwise go untreated and be

left without a remedy because traditional medical malpractice law affords no claim for failure to treat." *Bryan*, 95 F.3d at 351.

### (ii)

A motion to dismiss for failure to state a claim is made pursuant to Fed.R.Civ.P. 12(b)(6).[1] "[A] rule 12(b)(6) motion should be granted only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). In considering a motion to dismiss, the court must consider all facts and well-pled allegations in the complaint as true and all contrary allegations of the opposing party are to be disregarded. *See Hospital Bldg. Co. v. Rex Hosp. Trustees*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Therefore, a defendant's motion to dismiss will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted); *see also Bryan*, 95 F.3d at 352–53.

### (iii)

Gerber arrived at Northwest Hospital Center's emergency room on July 14, 1994, complaining of lower abdominal burning and pain, oral acid feeling, coated tongue, rectal bleeding and bloody stools, which she had been experiencing for approximately one month. Compl. ¶ 4. In describing her condition to a member of the hospital's intake staff, Gerber stated that her complaints had become so unbearable that she felt like killing herself. *Id.* In addition, while dressing for her examination, she told the attending nurse that she "would just rather die than always be ill." *Id.* ¶ 5. Shortly thereafter, Gerber was examined by Dr. Neustadt. She advised him that she had so much pain she felt like killing herself, said she wanted to die and begged him to help her. *Id.* ¶ 6. (The friend that accompanied Gerber to the hospital also advised Dr. Neustadt that she had discussed suicide earlier. Compl. ¶ 7.)

Dr. Neustadt diagnosed Gerber as suffering from irritable bowel, esophageal reflux, hiatal hernia and lower gastrointestinal bleeding. *Id.* ¶ 8. He ordered demerol and benadryl for her pain, prescribed additional medication and instructed her to follow up with a physician she had previously seen but who had been unable to diagnose her condition or recommend any satisfactory treatment. *Id.* Gerber was then discharged from treatment at Northwest.

Two days later, on July 16, 1994, the demerol and benadryl began to wear off and her abdominal pain returned. She again became severely depressed, and she felt overwhelmed by a sense of hopelessness. Consequently, she wrote a suicide note and then shot herself in the head. *Id.* ¶ 10. The bullet severed her right optic nerve, causing permanent and total loss of sight in her right eye. *Id.*

### (iv)

The gravamen of Gerber's allegations is that, while on many prior occasions (in treating other patients) Dr. Neustadt called in one of any number of readily available mental health care professionals to screen patients who had come to Northwest's emergency room with psychiatric complaints, he failed to

---

**1.** The only substantive evidentiary attachment to defendant Northwest Hospital's alternative motion to dismiss or for summary judgment is a copy of the hospital records related to the plaintiff's visit. Plaintiff does not object to the Court's consideration of the hospital records in connection with the motion and, indeed, contends that the records actually support her theory of the case. *See* Pl's Mem. in Opp. to Df's Mot. to Dismiss or in the Alt., for Summ.J. at 5, 7. Accordingly, the motion shall be treated as a motion to dismiss for failure to state a claim.

Even if, notwithstanding plaintiff's acquiescence, consideration of the emergency room records converts the motion to a motion for summary judgment as a matter of law, summary judgment would be appropriate under familiar standards. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Significantly, plaintiff has not suggested any need to conduct discovery in order to respond adequately to the motion.

provide her with such services. *Id.* ¶ 9. Her theory is that this failure to address her depression and suicidal ideation were the direct and proximate cause of her suicide attempt, as well as the injuries she sustained as a result of that attempt. *Id.* ¶ 10.

Thus, Gerber seeks to assert two distinct claims under EMTALA, albeit in only one count. First, she contends that the defendants' failure to address her psychiatric complaints violated 42 U.S.C. § 1395dd(a), which provides that if any individual comes to the emergency department of a hospital participating in Medicare ("a participating hospital"), and a request is made on the individual's behalf for examination or treatment for a medical condition, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists." *Id.* This is her "failure to screen" claim. Second, she claims that her allegations present a cognizable claim under EMTALA for the defendants' failure "to stabilize [her] medical condition." 42 U.S.C. § 1395dd(b)(1) [2]. Specifically, Gerber contends that only her physical complaints were treated while her psychiatric symptoms were ignored, and as a result of this failure to stabilize her psychiatric condition, she shot herself, giving rise to an EMTALA "failure to stabilize" claim. Pl's Mem. in Opp. to Df's Mot. to Dismiss or in the Alt., for Summ.J. at 4–5.[3]

(v)

■ In passing EMTALA, Congress intended to allow patients to bring civil suits for damages for statutory violations only against participating hospitals. *Baber v. Hospital Corp. of America,* 977 F.2d 872, 877 (4th Cir.1992) ("[T]he statute's legislative history demonstrates that Congress intended to limit the patient's right to recover damages for violations of EMTALA to suits against hospitals."). Thus, the statute creates no private right of action against individual physicians. *Id.* at 876; *Brooks,* 996 F.2d at 709–10 & nn. 1–2. Indeed, "nothing in the language of the statute permits a private individual to recover personal injury damages from a physician for an EMTALA violation." *Baber,* 977 F.2d at 877; *see also Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1256 (9th Cir.1995).

■ Accordingly, Gerber's ostensible EMTALA claims against Dr. Neustadt in his individual capacity must be dismissed for failure to state a claim upon which relief can be granted. Similarly, Gerber's EMTALA claims against Capital Emergency Associates must also be dismissed inasmuch as Capital's inclusion in this suit rests solely on its role as Dr. Neustadt's professional medical corporation at the time of the events described in the complaint. Since there is no private cause of action under EMTALA against physicians, it follows that there is no private cause of action against their medical corporations. *See e.g., Reynolds v. Mercy Hosp.,* 861 F.Supp. 214, 220–21 (W.D.N.Y.1994) (holding that no cause of action against private physicians or their medical professional corporations may be brought under EMTALA); *Power v. Arlington Hosp.,* 800 F.Supp. 1384, 1386 (E.D.Va.1992) (same), *aff'd in part,*

---

**2.** That section provides as follows, in relevant part:

(1) In general
If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
(B) for transfer of the individual to another medical facility in accordance with subsection (C) of this section.

**3.** In seeking to satisfy the requirements for a claim under EMTALA, Gerber asserts that her suicidal ideation was an "emergency medical condition" within the meaning of 42 U.S.C. § 1395dd(e)(1), in that it was a medical condition "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in ... placing [her] health in serious jeopardy." In deciding this case, I need not determine whether a mere threat of suicide, without more, constitutes an "emergency medical condition." *Cf. Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1258 (9th Cir.1995).

*rev'd in part on other grounds,* 42 F.3d 851 (4th Cir.1994).

### (vi)

■ As to Northwest Hospital Center, I am persuaded that Gerber has failed to state a claim. With respect to the "failure to screen" claim, Gerber misapprehends the statutory requirements. While the text of the statute does not define the term "appropriate medical screening examination," it has been interpreted to require hospitals to " 'apply uniform screening procedures to all individuals coming to the emergency room' " to determine whether an emergency medical condition exists. *Vickers,* 78 F.3d at 143 (quoting *Matter of Baby K,* 16 F.3d 590, 595 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994)). Essentially then, the screening provision " 'aims at disparate treatment.' " *Id.* (quoting *Brooks,* 996 F.2d at 713). Gerber alleges that she received disparate treatment at Northwest in that she arrived at the emergency room with two distinct complaints, physical complaints of abdominal pain and psychiatric symptoms manifested as verbal suicidal ideation. Yet, Dr. Neustadt, as agent, servant and/or employee of the hospital, diagnosed and treated her physical complaints, but did not address her psychiatric complaints, even though psychiatric services were readily available and had been provided to patients with psychiatric complaints in the past. Comp. ¶¶ 2, 9; Pl's Mem. in Opp. to Def's Mot. to Dismiss or in the Alt., for Summ.J. at 4. As a matter of law, however, such medical judgments do not constitute "disparate treatment." *See Baber,* 977 F.2d at 879; *Vickers,* 78 F.3d at 144.

In light of the tragic events ultimately resulting in the filing of this lawsuit, it is readily apparent that Gerber suffered from mental as well as physical difficulties. Nonetheless, the facts of this case make it equally apparent that Dr. Neustadt treated Gerber "for what he perceived to be her medical condition." *Baber,* 977 F.2d at 885; *see also Vickers,* 78 F.3d at 144. As previously noted, Gerber's complaint alleges that she informed members of the hospital staff that her physical complaints had become so unbearable that she felt like killing herself, and that she would rather die than always be ill. The complaint further states that she told Dr. Neustadt that she had so much pain she felt like killing herself and begged for his help.

The complaint (as supplemented by the emergency room records) reveals that, in an effort to determine whether Gerber's "acute symptoms" of "severe pain" constituted an "emergency medical condition," Dr. Neustadt performed an in-depth physical examination on her, which included X-rays and laboratory studies. Based on the results of this examination, Dr. Neustadt provided Gerber a diagnosis and prescribed a course of treatment. Accordingly, Northwest maintains that because, in Dr. Neustadt's medical judgment, Gerber's complaints were of a purely medical nature, he did not find that a psychiatric consult was needed. Df's Mot. to Dismiss, or in the Alt., for Summ.J. at 6. The hospital thus contends that while Gerber has the right to question the reasonableness of his medical conclusions, such " 'is the province of state malpractice law.' " *Id.* (quoting *Vickers,* 78 F.3d at 145). In these respects, the hospital is entirely correct.

Dr. Neustadt's failure to recognize that Gerber presented independent underlying psychiatric problems may well support a claim for negligent failure to diagnose; however, "[q]uestions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery." *Baber,* 977 F.2d at 880. As previously noted, however, Congress did not intend for EMTALA to be employed as a federal malpractice statute. *See, e.g., Brooks,* 996 F.2d at 710.

■ Hence, the conclusion is inescapable that Dr. Neustadt's failure to address Gerber's psychiatric condition does not establish a violation of EMTALA's "appropriate medical screening examination" provision. On the contrary, the uncontroverted facts demonstrate that the physical examination and battery of tests performed on Gerber constituted a medical screening examination designed to determine the existence of an "emergency medical condition." On the basis of this examination and the subsequent

diagnosis, Dr. Neustadt prescribed a course of treatment for what he perceived as her medical condition. While, in hindsight, it is at the very least arguable that he should have arrived at a different or more comprehensive diagnosis, "[a]nalysis by hindsight is not sufficient to impose liability under EMTALA." *Baber*, 977 F.2d at 883; *see also Vickers*, 78 F.3d at 145.

■ It is also worth noting that, with respect to her "failure to screen" claim, Gerber does not allege that the treatment she *in fact* received differed from that received by individuals *perceived* to have the same condition. Evidence of disparate treatment is at the core of such an EMTALA claim. Correspondingly, "EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment." *Vickers*, 78 F.3d at 144. Moreover, when, as in the instant case, a doctor exercises medical judgment in rendering a diagnosis,

> the decision to prescribe a treatment responding to the diagnosis *cannot form the basis of an EMTALA claim of inappropriate screening* . . . . In fact, not only does treatment based on diagnostic medical judgment not violate the Act, it is precisely what EMTALA hoped to achieve—handling of patients according to an assessment of their medical needs, without regard to extraneous considerations such as their ability to pay.

*Id.* (citation omitted) (emphasis added). In this regard, the Court had earlier observed: "We recognize that application of the [screening] procedure necessarily requires the exercise of medical training and judgment. Hospital personnel must assess a patient's signs and symptoms and use their informed judgment to determine whether a critical condition exists." *Baber*, 977 F.2d at 879. Therefore, even viewing the allegations in the complaint in this case in the light most favorable to the plaintiff, for the reasons discussed above, Gerber has failed to state an EMTALA claim for failure to provide an appropriate medical screening examination.

■ Gerber also alleges that the fact that she attempted suicide shortly after her discharge from the hospital is sufficient to support an EMTALA claim for failure "to stabilize [her] medical condition." Under EMTALA, when a hospital "determines that [an] individual has an emergency medical condition," the hospital must provide such further examination and treatment "as may be required to stabilize the medical condition." 42 U.S.C. 1395dd(b)(1). This provision, however, "takes the actual diagnosis as a given, *only obligating hospitals to stabilize conditions they actually detect.*" *Vickers*, 78 F.3d at 145 (emphasis added). The statute does not "hold hospitals accountable for failing to stabilize conditions of which they were not aware, *or even conditions of which they should have been aware* . . . EMTALA would otherwise become coextensive with malpractice claims for negligent treatment." *Id.* (emphasis added); *see also Baber*, 977 F.2d at 883.

In the instant case, the complaint demonstrates that Dr. Neustadt made a diagnosis based on the medical condition he detected and thus prescribed various medications to stabilize her condition prior to discharging her. The complaint states:

> The Defendant Dr. Neustadt diagnosed "Irritable Bowel, Esophageal Reflux, Hiatal Hernia, Lower GI Bleed" [sic] and ordered demeral and benadryl for Plaintiff's pain, prescribed additional medication and instructed her to follow up with a physician whom Plaintiff had seen previously but who had been unable to diagnose Plaintiff's condition or recommend any satisfactory treatment.

Compl. ¶ 8. In light of the controlling law, this evidence alone is sufficient to defeat Gerber's "failure to stabilize" claim.

Accordingly, I find that while Gerber's complaint details a most unfortunate set of circumstances, it nonetheless fails to state an EMTALA claim upon which relief can be granted. Thus, I shall grant defendants' motions to dismiss with prejudice.