ELMER TRIVETTE AND NANCY TRIVETTE, AS CO-ADMINISTRATORS OF THE LATE RANDY JAMES TRIVETTE, AND NANCY TRIVETTE, INDIVIDUALLY, PLAINTIFFS v. NORTH CAROLINA BAPTIST HOSPITAL, INC., DEFENDANT

No. COA97-1557

(Filed 6 October 1998)

1. Hospitals— emergency treatment—initial screening exam—disparate treatment—federal liability

The trial court did not err by granting summary judgment for defendant in an action arising from the treatment of decedent at a hospital where plaintiffs contended that there was a genuine issue of material fact as to whether defendant-hospital failed to provide decedent with an appropriate screening examination in violation of the federal Emergency Medical Treatment and Active Labor Act. The key requirement under EMTALA's screening provision is uniform treatment among similarly situated patients regardless of their ability to pay; questions regarding proper diagnosis or treatment are best resolved under state negligence and medical malpractice theories.

2. Hospitals— emergency treatment—stabilization before discharge—unperceived condition—federal liability

The trial court did not err by granting summary judgment for defendant in an action arising from the treatment of decedent at a hospital where plaintiffs contended that there was a genuine issue of material fact as to whether defendant-hospital discharged the decedent before stabilizing him in violation of the federal Emergency Medical Treatment and Active Labor Act. A hospital must perceive the seriousness of the medical condition and fail to stabilize it to be liable under EMTALA and cannot be liable under EMTALA for failing to stabilize conditions it did not perceive even if it was negligent in not perceiving the condition. The defendant in this case met its EMTALA duties because it determined prior to discharging decedent that the seizure which it perceived to be decedent's emergency medical condition no longer seriously jeopardized his health.

Judge GREENE dissenting.

Appeal by plaintiffs Elmer and Nancy Trivette from summary judgment entered 7 October 1997 by Judge Sanford L. Steelman in Forsyth County Superior Court. Heard in the Court of Appeals 22 September 1998.

*Moore and Brown, by B. Ervin Brown, II, for the plaintiff-appellants.*

*Kilpatrick Stockton, by J. Robert Elster, Richard S. Gottlieb, for the defendant-appellee.*

WYNN, Judge.

Plaintiffs' decedent, Randy Trivette, a severely disabled adult, lived under the total care of his parents all of his life. On May 2, 1996, Randy was taken by ambulance to defendant North Carolina Baptist Hospital because of continuous vomiting, choking, limpness, pallor, and a decrease in mental status. Randy was unconscious at the time he was admitted.

Upon arrival at the emergency room, Randy was given a screening examination which included a battery of tests and chest x-rays. The medical screening and accompanying tests showed, *inter alia*, that his white blood cell count was elevated, his iron levels were low and his eyes were fully dilated. Based on these results, Randy was diagnosed as having a possible seizure, and therefore was admitted to the hospital.

The following morning, Randy's primary care physician determined that Randy's condition had stabilized, and discharged him. Within twelve hours of Randy's discharge, he was taken by ambulance to Forsyth Memorial Hospital where he was diagnosed with gastrointestinal bleeding and a cerebral hemorrhage. Randy stayed at Forsyth hospital for twenty-one days before being discharged. He died approximately four months later.

On July 6, 1997, plaintiffs filed suit against North Carolina Baptist Hospital (hereafter "hospital") alleging violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 13955dd (1994) (hereafter "EMTALA"). Specifically, plaintiffs contend that defendant hospital violated EMTALA by: (1) failing to provide Randy with an appropriate medical screening, and (2) by discharging him before stabilizing his medical condition. Defendant hospital answered plaintiffs' complaint, and thereafter motioned for summary judgment. The trial court granted defendant's summary judgment motion by explicitly relying on the Fourth Circuit's holding in *Vickers v. Nash County General Hosp., Inc.*, 78 F.3d 139 (4th Cir. 1996). We affirm.

**TRIVETTE v. N.C. BAPTIST HOSP., INC.**

[131 N.C. App. 73 (1998)]

I.

Summary judgment is appropriate "if the pleadings, depositions, interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law." *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 252, 266 S.E.2d 610, 615 (1980). Summary judgment is proper where it appears that even if the plaintiff's facts as alleged are true, the law does not provide for recovery. *Lowder v. Lowder*, 68 N.C. App. 505, 506, 315 S.E.2d 520, 521, *disc. rev. denied* 311 N.C. 759, 321 S.E.2d 138 (1984).

In 1986, Congress enacted EMTALA to address the growing problem of "patient dumping"—the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring such patients before their emergency conditions are stabilized. *Vickers v. Nash General Hosp. Inc.*, 78 F.3d 139, 142 (4th Cir. 1996). To prevent patient dumping, EMTALA imposes upon hospitals two principal obligations: (1) when an individual seeks treatment in an emergency room, the hospital must provide for an appropriate medical screening examination, and (2) if the screening examination reveals an "emergency medical condition," the hospital must stabilize that condition before transferring or discharging the patient. 42 U.S.C. §§ 1395dd(a), 1395dd(b)(1) (1993). EMTALA imposes these *limited* duties upon hospitals with emergency rooms because EMTALA was primarily, if not solely, enacted to deal with the problem of patients being turned away from emergency rooms for non-medical reasons. *Bryan v. Rectors & Visitors of the Univ. of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996). Moreover, these duties are "limited" in a very critical sense: "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Power v. Arlington Hosp. Assn.*, 42 F.3d 851, 856 (4th Cir. 1994) (emphasis added).

In the case *sub judice*, plaintiffs argue that the trial court improperly granted defendant's summary judgment motion. Specifically, plaintiffs argue that there are genuine issues of material fact with respect to its two claims; first, that defendant hospital failed to provide Randy with an "appropriate" screening examination in violation of § 1395dd(a), and second that defendant hospital discharged Randy before stabilizing his condition in violation of § 1395dd(b)(1).

A.

**[1]** Under EMTALA's Medical screening requirement, 42 U.S.C. § 1395dd(a), when an individual comes to a hospital emergency room for treatment, the hospital must "provide for an *appropriate* medical screening examination." EMTALA, however, fails to define the phrase "appropriate. medical screening examination" beyond stating that its purpose is to identify "emergency medical condition[s]." *Power*, 42 F.3d at 856. Nonetheless, numerous courts have consistently interpreted this phrase to only require a hospital to develop a screening examination designed to identify emergency medical conditions, and to apply that screening examination uniformly to all patients with similar complaints. *Id. Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710-11 (4th Cir. 1993); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879 (4th Cir. 1992). That is, the key requirement under EMTALA's screening provision is uniform treatment among similarly situated patients regardless of their ability to pay. Given the narrow duties imposed under EMTALA's screening requirement, this provision does not guarantee that the screening examination will result in a correct diagnosis or adequate care.[1] *Baber*, 977 F.2d at 879. Indeed, "questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery." *Vickers*, 78 F.3d at 142 (*citing Baber*, 977 F.2d at 880).

Appellants contend that Randy was not provided with an "appropriate screening examination" because certain tests recommended by Randy's emergency room doctor were never given. Appellants contend that because the hospital failed to conduct the recommended tests and procedures, the hospital, in essence, "failed to treat" Randy. We find appellants' argument without merit.

As previously stated, a hospital satisfies EMTALA's screening requirement if it uniformly applies a standard medical screening examination. *Brooks*, 996 F.2d at 713. EMTALA, moreover, recognizes a distinction between an initial screening examination and the adequacy and correctness of subsequent treatment. *Vickers*, 78 F.3d at

---

1. There is still some debate whether a hospital's screening standard can be so low as to constitute a "failure to treat," and hence constitute an EMTALA violation. *Baber*, 977 F.2d at 879 n.7. Although plaintiffs have raised the "failure to treat" issue, we need not address it because we believe that the defendant hospital, by giving Randy a battery of tests and admitting him to the hospital, had an adequate screening procedure which certainly could not equate to a "failure to treat."

**TRIVETTE v. N.C. BAPTIST HOSP., INC.**

[131 N.C. App. 73 (1998)]

143. That is, EMTALA is applicable only to the extent that it requires a hospital emergency room to provide all similarly situated patients with uniform *initial* screening procedures. Once EMTALA's screening requirements are met, the patient's subsequent diagnosis and medical care become the hospital's legal responsibility. *Bryan*, 95 F.3d at 351. Thus, the legal adequacy of that diagnosis and subsequent care is governed by state malpractice law, not EMTALA. *Id.*

In *Vickers*, for example, plaintiff alleged that the defendant hospital violated EMTALA's screening requirement using the following syllogism: decedent arrived at the emergency room with a severe laceration of the head; patients with severe head injuries normally undergo certain tests for intra cranial injury; because decedent did not receive those tests, he received disparate treatment. *Vickers*, 78 F.3d at 143. The Court, however, in ruling against plaintiff noted that the defendant hospital did in fact meet EMTALA's screening requirement because the attending physician repaired the laceration and took some x-rays. *Id.* Although the Court conceded that further tests may have saved the decedent's life, it held that these questions related to improper diagnosis and testing, and thus were the exclusive province of state negligence and malpractice law. *Id.*

Similarly, in *Gerber v. Northwest Hosp. Center, Inc.*, 943 F. Supp. 571 (D. Md. 1996), plaintiff filed suit claiming that the defendant hospital violated EMTALA's screening requirement by not addressing her psychiatric symptoms. Specifically, plaintiff complained that the attending physician should have recognized she was seriously depressed because she repeatedly mentioned that she wanted to kill herself and would rather die than always be ill. *Id.* at 574. The court, after noting that the doctor performed a battery of tests, held for the defendant hospital. *Id.* at 574-75. In so ruling, the court stated that although it was arguable that the physician should have performed more or different tests to reach a different or more comprehensive diagnosis, the physician nonetheless met EMTALA's mandate that he treat all similarly situated patients uniformly during their initial screening examination. *Id.*

Similar to the cases mentioned, appellants in the case *sub judice* contend that the attending physician should have conducted further testing to determine the nature of Randy's ailments. The appellant correctly points out that in this case, unlike in the cases mentioned, the physician actually recommended further testing that was never performed. Nonetheless, "the correctness of the treatment that follows the [initial] screening" is an issue exclusively in the province of

state negligence and malpractice law. Relevant to the case *sub judice* is the fact that the attending physician performed a battery of tests and admitted the patient to remain in the hospital overnight. These actions constitute an "appropriate screening examination" for EMTALA purposes.

Additionally, we note that plaintiff failed to produce any evidence of disparate treatment by defendant hospital toward Randy during this initial screening examination. Indeed, defendant hospital performed what it perceived to be all the necessary tests, and as a consequence of the results of those tests, admitted Randy to the hospital for treatment. These actions do not demonstrate conduct which offends EMTALA's primary goal of preventing patients from being turned away from hospital emergency rooms for non-economic reasons. Therefore, we affirm the trial court's granting of summary judgment on the § 1395dd(a) issue.

B.

[2] According to EMTALA's stabilization requirement, when a hospital determines that an individual has an "emergency medical condition," the hospital must "stabilize" that condition before transferring or discharging the individual. 42 U.S.C. § 1395dd(b)(1) (1994). A condition is deemed an "emergency medical condition" when it "manifests itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e). EMTALA's stabilization requirements, however, apply only if the hospital *actually* determines that the patient suffers from an emergency medical condition. *Baber*, 977 F.2d at 883 (emphasis added). Indeed, to be liable under EMTALA's stabilization requirement, "a hospital must actually perceive the seriousness of the medical condition and nevertheless fail to stabilize it." *Vickers*, 78 F.3d at 145. Accordingly, a hospital cannot be liable under EMTALA for failing to stabilize conditions it did not perceive, even if the hospital was negligent in not perceiving.

In the case *sub judice*, plaintiffs allege that defendant hospital violated EMTALA's stabilization requirement by discharging Randy even though he was in exactly the same condition as when he arrived. Plaintiffs argue there is a genuine issue of material fact as to whether Randy's condition was "stabilized" prior to his discharge. In making

**TRIVETTE v. N.C. BAPTIST HOSP., INC.**

[131 N.C. App. 73 (1998)]

this argument, plaintiffs note that there is no record that Randy stopped vomiting, that his blood count improved, or that he, even regained consciousness. Although this information is relevant to a medical malpractice or negligence claim, it is of little import to the case *sub judice*.

Defendant hospital, in determining to discharge Randy, concluded that Randy had most likely suffered from a seizure and that his condition had stabilized. There is no evidence that defendant hospital perceived or actually knew of Randy's gastrointestinal bleeding or cerebral hemorrhage. Because the defendant hospital did not perceive or know of this condition, it did not have a duty under EMTALA to stabilize it. Rather, defendant hospital had a duty to stabilize what it perceived to be Randy's emergency medical condition—the seizure. Therefore, when the defendant hospital determined prior to discharging Randy that the seizure no longer seriously jeopardized his health, the defendant hospital met its EMTALA duties. Accordingly, we affirm the trial court's decision to grant summary judgment on this issue.

In conclusion, we find there is no genuine issue as to any material fact, and therefore affirm the trial court's decision to grant summary judgment in this matter.

Affirm.

Judge WALKER concurs.

Judge GREENE dissents in a separate opinion.

This opinion was authored and delivered to the Clerk of the North Carolina Court of Appeals by Judge Wynn prior to 1 October 1998.

Judge GREENE dissenting.

In this case, there is uncontradicted evidence that Randy did not receive certain tests recommended by the emergency room doctor. This evidence presents a genuine issue of fact as to whether Randy was provided an "appropriate screening examination," as required by the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (Supp. 1998). I, therefore, would reverse summary judgment for the defendant hospital and remand.